**Keith LAWS, Plaintiff,**

v.

**Captain Michael CLEAVER, et al., Defendants.**

**No. 3:96CV92 (JBA).**

United States District Court, D. Connecticut.

Feb. 9, 2001.

Bradford S. Babbitt, Jeffrey Clyde Kestenband, Robinson & Cole, Hartford, CT, for plaintiff.

Ann E. Lynch, Attorney Genral's Office, Hartford, CT, for defendants.

**OPINION**

ARTERTON, District Judge.

**I. Introductory Statement**

After an altercation involving plaintiff Keith Laws' attempts to be heard at an internal prison disciplinary hearing, he brought suit against three corrections officers at McDougall Correctional Institute charging them with violations of the consti-

tutional prohibition on cruel and unusual punishment and depriving him of his due process rights. The facts surrounding the disciplinary hearing and resulting altercation were hotly disputed, and after a four-day trial, the jury rendered a verdict accepting plaintiff's version of events, although on plaintiff's Eighth Amendment claim it found that all defendants, while acting maliciously or sadistically, were nonetheless protected by qualified immunity, and found only defendant Cleaver liable for the due process deprivation. The defendant then renewed its Rule 50 motion for judgment as a matter of law, and also moved for a new trial, on the grounds that Laws failed to establish the personal involvement of defendant Cleaver, and that under controlling Supreme Court precedent, Laws did not sufficiently state a liberty interest. Plaintiff also moved for a new trial on his Eighth Amendment claim, arguing that an evidentiary ruling of this Court substantially prejudiced him, warranting a new trial. After careful consideration and extensive review of the case law on the subject, the Court agrees with defendants that plaintiff has not demonstrated that a constitutionally protected liberty interest was affected by the defendants' conduct, and that plaintiff is not entitled to a new trial on his Eighth Amendment claim for the asserted evidentiary error.

**II. Factual Background**

Taking all factual disputes as being resolved in the plaintiff's favor, the evidence at trial reveals the following. On November 20, 1995 petitioner was summoned from his cell at McDougall Correctional Institution for a hearing on a disciplinary report plaintiff had received for intoxication. At the time plaintiff received the notice of the hearing, he was returning from the shower area, as his housing unit

had just emerged from a "lock down" period during which inmates could not leave their cells. According to Mr. Laws, he did not leave immediately upon receiving the notice, but instead first gathered his toiletry items, because he knew he faced the possibility of being moved into a separate area of the prison if he was found guilty, and then went to his hearing. Upon arrival, plaintiff discovered that the hearing had been conducted in his absence, and he was informed that he had been found guilty on the intoxication violation. Plaintiff was then ordered to strip, in order to be processed into the restrictive house unit (RHU). He was informed that as a result of the intoxication violation, he would receive 15 days punitive segregation, 30 days loss of visits, 45 days loss of good time and 15 days confined to quarters.

Plaintiff became upset, because he believed he had a meritorious defense to the intoxication violation on which he had not been permitted to be heard, based on discrepancies between the date on the urine test and the date he was tested. While he began to comply with the order to strip, he repeatedly asked to be heard, and when he learned that the hearing officer was still in the unit, he began to back away from the officers, at which point he backed into a large scale that was in the room. At this point, Captain Cleaver sprayed his mace at Mr. Laws, who ducked to avoid it and then ran into the next room to importune the hearing officer to allow him to make his case. Plaintiff testified that he shook the door of the hearing room, insisting that he wanted to be heard, and that he was "frantic" because he knew that it was a matter of seconds "before something else happened." Tr. at 53. Something else did happen, as plaintiff testified that he was punched, forced to the ground and then pinned down as the other officers kicked and stomped him. Tr. at 60–61. The hearing officer then entered the room, as did a number of other individuals, and Mr. Laws was cuffed, placed in a shower to wash off the mace, and placed in "four point restraints"—meaning, he was cuffed spread-eagle to a soiled cot. Tr. at 76–77. At trial, the jury viewed a videotape of the latter part of this incident, during which plaintiff appeared docile and non-threatening.

Plaintiff filed an initial appeal of the intoxication disciplinary report based on the discrepancy in dates, which was never heard, although he had submitted the appeal to Captain Cleaver. Mr. Laws then filed a second appeal, as well as a civil rights complaint under 42 U.S.C. § 1983 regarding the disciplinary hearing and subsequent physical encounter. After his federal complaint was filed, on February 10, 1996 the district administrator reversed the guilty finding on the intoxication violation, noting the "procedural failures" that had occurred, and ordered the restoration of lost good time credits. Tr. at 9; Pl.Ex. 3. Counsel was appointed on Mr. Laws' federal civil rights claim, and this case went to trial in March of 2000.

## II. Standard

On a motion for judgment as a matter of law pursuant to Rule 50(b), a district court may grant a motion for judgment as a matter of law only if:

> there exists "such complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or the evidence in favor of the movant is so overwhelming "that reasonable and fair minded [persons] could not arrive at a verdict against [it]."

*Luciano v. The Olsten Corp.*, 110 F.3d 210, 214 (2d Cir.1997) (*quoting Cruz v. Local Union No. 3*, 34 F.3d 1148, 1154 (2d Cir. 1994)). "Judgment n.o.v. is proper 'only if

the evidence viewed in the light most favorable to the non-movants, without considering credibility or weight, reasonably permits only a conclusion in the movant's favor.'" *Doctor's Assoc., Inc. v. Weible,* 92 F.3d 108, 112 (2d Cir.1996) (*quoting Baskin v. Hawley,* 807 F.2d 1120, 1129 (2d Cir.1986)).

■ As for defendant's motion for a new trial, Rule 59(a) of the Federal Rules of Civil Procedure provides: "A new trial may be granted ... for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." As a general matter, "[a] motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice." *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir. 1992) (quotation marks and citation omitted). A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence. *See Byrd v. Blue Ridge Rural Elec. Co-op.,* 356 U.S. 525, 550, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); *see also Dunlap–McCuller v. Riese Organization,* 980 F.2d 153, 157 (2d Cir.1992); *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992).

## III. Discussion

### A. *Defendants' Motion for Judgment as a Matter of Law*

Defendant claims that it is entitled to judgment as a matter of law on the Due Process Claim for a variety of reasons. As the Court finds one aspect of defendants' motion meritorious and dispositive of the remaining issues, the Court's analysis is confined to the issue of whether Mr. Laws sufficiently identified a liberty interest that was protected by the Fourteenth Amendment's guarantee of due process of law.

### 1. *Sandin v. Connor and the Creation of Liberty Interests*

■ The two threshold questions in any § 1983 claim for denial of procedural due process are whether the plaintiff has established a liberty or property interest that is protected by the United States Constitution or federal statutes and, if so, what process was due before plaintiff could be deprived of that interest. *Green v. Bauvi,* 46 F.3d 189 (2d Cir.1995). A liberty interest may arise by virtue of the Due Process clause itself, *see, e.g., Washington v. Harper,* 494 U.S. 210, 221–222, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (Due Process clause provides prisoner with liberty interest in being protected from involuntary administration of antipsychotic drugs), or may be created independently by the state, *see, e.g., Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (although Due Process clause itself does not create liberty interest in good time credits, Nebraska statutory scheme at issue created a right to shortened sentence through the accrual of good time credits, and so statutory provision created a liberty interest). After the Supreme Court's decision in *Wolff,* the lower federal courts followed a mode of analysis which looked to whether the statutory provision at issue created a liberty interest through the use of mandatory language. *See, e.g., Russell v. Coughlin,* 910 F.2d 75, (2d Cir.1990).

■ In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court reexamined the circumstances under which state prison regulations may create a liberty interest protected by the Due Process Clause, and abandoned the methodology of *Hewitt,* finding that it had strayed from the "real concerns undergirding the liberty protected by the Due Process clause." *Id.* at 483, 115 S.Ct. 2293. Under the Supreme Court's new framework, in order for a

liberty interest arising under state law to trigger the protections of the Due Process clause, (1) the state statutes or regulations at issue must narrowly restrict the power of prison officials to impose the deprivation—giving the inmate the right to avoid it—and (2) the liberty in question must be one of "real substance." 115 S.Ct. at 2297. In regard to the latter inquiry, *Sandin* looked to whether the restraint "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," or whether it will "inevitably affect the duration of [a] sentence." *Id.* at 2300, 2302.

Applying the new framework to the facts of that case, the *Sandin* Court determined that 30 days disciplinary segregation did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. *Id.* at 2301. The Court compared the 30 days to the 30 years-to-life sentence plaintiff was serving, and concluded that it did not represent a dramatic departure from the basic conditions of the prisoner's indeterminate sentence, and also noted that the prison also imposed lockdowns and other discretionary confinement on inmates in the general population. Since the most serious charge was expunged from the prisoner's record, the chance that the duration of his sentence would be affected was "too attenuated to invoke the procedural guarantees of the Due Process Clause," as the prisoner would be afforded various procedural protections at the parole hearing to explain the circumstances behind the remaining charges. *Id.* at 2302.

2. *Application of the Sandin Standard in this Circuit*

Since *Sandin*, the focus in prison due process litigation has been on whether the degree and duration of the inmate's con-

finement implicates a state-created liberty interest. A number of courts in this Circuit have compared the discipline imposed on various prisoners to that in *Sandin* to conclude that even lengthy disciplinary and administrative confinements do not implicate liberty interests. *See, e.g., Rivera v. Coughlin,* No. 92 Civ. 3404, 1996 WL 22342 (S.D.N.Y. Jan.22, 1996) (89 days in keeplock does not constitute atypical or significant hardship to create liberty interest); *Sealey v. Giltner,* 197 F.3d 578 (2d Cir.1999) (101 days in administrative segregation in Special Housing Unit, where inmate confined to cell for 23 hours a day with one hour out for recreation, limited to three showers a week and forbidden various privileges, did not amount to atypical and significant hardship warranting due process protections under *Sandin* ). Confinement periods similar to the one imposed in this case have also been found to implicate no liberty interest. *See Frazier v. Coughlin,* 81 F.3d 313 (2d Cir.1996) (prisoner confined in Special Housing Unit for 12 days did not have liberty interest); *Walker v. Mahoney,* 915 F.Supp. 548 (E.D.N.Y.1996) (same for 23 days in disciplinary and administrative segregation). While the Second Circuit has not adopted a bright-line rule as to how lengthy a SHU confinement will be considered atypical and significant, *see Sims v. Artuz,* 230 F.3d 14 (2nd Cir.2000), Judge Newman has indicated a preference for establishing a rule that confinement in normal SHU conditions for more than 180 days meets the *Sandin* standard. *See Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (SHU confinement for 305 days sufficient departure from ordinary incidents of prison life to require due process before imposition; reversing district court's dismissal on summary judgment).

In determining whether a prison restraint constitutes an "atypical and sig-

nificant hardship" so as to implicate a liberty interest under state statute or regulations, the district court is required to "identify with specificity the facts upon which its conclusion is based," *Brooks v. Di Fasi*, 112 F.3d 46, 49 (2d Cir.1997), and examine the "circumstances of a confinement to determine whether the confinement affected a liberty interest." *Miller v. Selsky*, 111 F.3d 7, 9 (2d Cir.1997). The Second Circuit has reversed dismissals of Section 1983 due process claims where the district court failed to sufficiently articulate the factual predicates for its conclusions. *See, e.g., Brooks*, 112 F.3d at 48. In the context of jury trials, the Second Circuit has held that while the issue of atypicality is ultimately one of law, where there are factual disputes concerning the conditions or duration of confinement, the jury "must resolve those disputes and then apply the law of atypicality, as instructed by the Court." *Sealey*, 197 F.3d at 585.

In the instant case, however, there is no dispute regarding the duration of Mr. Laws' confinement or the conditions of his confinement, nor did either party seek a charge on atypicality. The Court, after colloquy with counsel at the charge conference regarding the nature of the liberty interest alleged here, concluded that the deprivation of good time credits constituted a sufficient liberty interest, and instructed the jury that as a matter of law, the plaintiff "had a right, under the United States Constitution, to be present and to present evidence in his defense at the disciplinary hearing." Jury Inst. at 17. As discussed below, that conclusion was in error, but it does not alter the Court's ability to review the issue as a matter of law at this juncture, because plaintiff was made aware of the *Sandin* issue at numerous charge conferences, and had his opportunity to develop the record at trial. Therefore, he can prevail only if the evidence of record is legally sufficient to support his claim that the confinement he received was atypical. *See Sealey*, 197 F.3d at 587 (assessing record after trial and concluding that plaintiff had failed to present sufficient evidence that his confinement was of a duration and degree to meet the *Sandin* standard).

### 3. Liberty Interests Claimed by Mr. Laws

The duration of the confinement here plainly does not rise to the level of atypical and significant, when compared to the above cases, and plaintiff does not argue that the conditions of his confinement were sufficiently severe to warrant the protection of due process. Rather, plaintiff focuses on the loss of his good-time credits, and being placed in four-point restraints for approximately four hours, and argues that these ancillary effects are sufficient to implicate his liberty interest in being free of them.

#### a). Good Time Credits

■ In Connecticut, the state Supreme Court has determined that the Due Process Clause gives prisoners a constitutionally protected liberty interest in statutorily-created good time credits. *McCarthy v. Warden*, 213 Conn. 289, 299, 567 A.2d 1187 (1989). It is undisputed that as a result of being found guilty on the intoxication violation, Mr. Laws lost 45 days of good time, but those credits were restored on administrative appeal, approximately a month after he initiated his civil rights suit. How the restoration of his good time credits affects his § 1983 claim, however, is the subject of considerable controversy between the parties.

Plaintiff argues that the loss of his earned good time credits implicates a liberty interest, notwithstanding its later restoration, because to find otherwise would

create *de facto* immunity for prison officials: in order to avoid liability for constitutional violations, they need only restore any lost good time credits once the inmate files suit. Plaintiff points to *Patterson v. Coughlin*, 761 F.2d 886 (2d Cir.1985), in which an inmate challenged due process failings at a disciplinary hearing which resulted in SHU confinement for sixty days and loss of sixty days good time. The good time was restored after the plaintiff filed an Article 78 proceeding in state court, and the plaintiff then filed a Section 1983 claim, which the district court dismissed because "no meaningful predeprivation hearing was possible" and the post-deprivation Article 78 hearing provided adequate opportunity to be heard "at a meaningful time and in a meaningful manner." 761 F.2d at 889–90. The Second Circuit reversed, finding that the Article 78 proceeding was inadequate to meet the requirements of due process, because "[o]nce a cause of action for a constitutional violation accrues, nothing that the state does subsequently can cut off the § 1983 claim." 761 F.2d at 893.

According to plaintiff, *Patterson* as applied to the facts of this case results in the following rule: once an inmate's liberty interest has vested by virtue of revocation of his good time credits, prison officials have a reasonable time to cure any due process violations, but if those violations are not remedied through administrative appeal, and the inmate then files a § 1983 action, any subsequent action by the state restoring the good time credits cannot strip plaintiff of his liberty interests, because they have already vested by the filing of his complaint. If the Court were to adopt this reasoning, Mr. Laws would therefore have a liberty interest, because his good time credits were restored only after his civil rights claim was filed. Plaintiff argues that this rule balances the interests in permitting prison officials to

correct their constitutional errors, as recognized in *Sandin*, but does not allow them to operate with absolute immunity.

Plaintiff's argument, while creative and perhaps a logical extension of *Patterson*, comes up against some difficult case law in this Circuit. Defendant points to *Young v. Hoffman*, 970 F.2d 1154 (2d Cir.1992), in which an inmate was found guilty of disciplinary violations after a hearing he was not allowed to attend, due to his disruptive behavior when he was escorted to the hearing area by prison guards. The hearing officer imposed 180 days confinement and six months lost good time, and the inmate appealed the decision to the director of the unit, who reversed. *Id.* at 1155. The penalty and loss of good time were vacated and the records expunged before the inmate began to serve a day of the penalty. When the inmate brought suit under § 1983, the Second Circuit held that the administrative reversal "constituted part of the due process protection he received, and it cured any procedural defect that may have occurred." *Id.* at 1156. As a policy matter, the court endorsed this approach because it furthered the salutary goals of encouraging prison administrators to correct errors as an alternative to forcing inmates to seek relief in federal courts, and it also noted in addition that on account of the administrative reversal, "Young was never penalized on the charges... [and] therefore, he suffered no interference with a liberty interest and has no valid claim for relief." *Id.*

Citing *Young*, one court has termed this a "no harm-no foul" approach, in concluding that an administrative reversal nullifies any constitutional violation. *Cespedes v. Coughlin*, 956 F.Supp. 454, 473 (S.D.N.Y. 1997). A number of other district courts are in accord, without regard to whether the civil rights complaint was filed before or after the good time credits were re-

stored pursuant to an administrative appeal. *See, e.g., Rivera v. Coughlin,* No. 92 civ. 3404, 1996 WL 22342 (S.D.N.Y. Jan. 22, 1996) (citing cases). Instead, in determining the existence of a liberty interest, courts look to whether the length of the inmate's sentence was affected; if the loss of good time is administratively reversed prior to the time that it affects release, no liberty interest existed. *See, e.g., Black v. Selsky,* 15 F.Supp.2d 311, 316 (W.D.N.Y. 1998 ); *see also Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir.1998) (where first hearing had been administratively reversed and plaintiff challenged alleged due process violations in second hearing under § 1983, court need not address inmate's claim regarding procedural violations at first hearing "because it became a nullity"; specifically noting that since the good time credits lost in the first hearing were restored, "Horne is not entitled to any relief in connection with the recommended loss of good time credits.").

 While there is some pre-*Sandin* Second Circuit case law holding that when an inmate has begun to serve a sentence of disciplinary confinement imposed at the conclusion of a hearing flawed by constitutional errors, a later administrative reversal does not cut off the inmate's cause of action, *see Walker v. Bates,* 23 F.3d 652 (2d Cir.1994), that case did not analyze whether the disciplinary confinement actually served was an atypical or significant hardship that could implicate a protected liberty interest. Prior to *Sandin,* courts in this Circuit had assumed that placement in New York's segregated housing unit implicated liberty interests under *Hewitt,* and therefore the only question addressed in *Walker* and in *Patterson* was whether a later § 1983 claim was barred by the inmate's success in his administrative appeal. In other words, *Walker* located the constitutional violation

at the point at which the inmate began to serve his sentence, while *Patterson* located it at the point of the hearing itself; under the *Sandin* analysis, however, there must be a liberty interest, triggered by an atypical and significant deprivation, before any constitutional implications attach at all. *Sandin* also changes the analysis in cases like *Walker* and *Patterson,* because it measures the degree of hardship suffered by the inmate in relation to the ordinary incidents of prison life; this determination necessarily requires a fact-specific analysis of the punishment actually suffered, rather than a prospective view of the punishment that might be imposed. *See Scott v. Albury,* 156 F.3d 283 (2d Cir.1998). *Scott* clarifies that *Sandin* mandates a retrospective analysis, meaning that the atypicality or significance of the hardship is measured in terms of the plaintiff's own actual experience. *Id.* at 286. Viewed from this perspective, plaintiff never actually experienced the loss of good time credits, because the violation and penalty was reversed before it had any opportunity to affect the length of his sentence.

For the foregoing reasons, the Court is persuaded that the cases of *Walker* and *Patterson* are of doubtful validity after *Sandin.* For this reason the jury charge in this case, which instructed the jury that plaintiff has a protected liberty interest once he begins to serve his sentence, was in error. *See* Jury Instruction at 15. Due to plaintiff's successful administrative appeal and the restoration of his good time credits, he had no liberty interest in those credits for due process purposes, even though at the time he brought suit they had not yet been restored.

Despite the logic, the implications of this result may have greater impact than the courts have discussed, given that it has long been the case that an inmate's sole judicial remedy for restoration of good

time credits is a writ of habeas corpus. *Preiser v. Rodriguez,* 411 U.S. 475, 500, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). If an inmate's good time credits have not been restored through administrative action, then any challenge to the procedures necessarily implies the invalidity of the punishment imposed and thus the length of his sentence, and therefore is not cognizable under § 1983. *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997). An inmate who is deprived of good time credits pursuant to a constitutionally-deficient hearing, therefore, has no recourse in damages: if the inmate has been stripped of those credits and seeks to have them reinstated, he can only proceed under the habeas regime, which requires him to first pursue his administrative remedies. However, if he is successful in having those credits restored through the administrative process, he has no § 1983 action. While this result may be inevitable, in effect it confers absolute immunity for money damages on prison officials involved in disciplinary hearings when it comes to sanctions involving good time credits—a level of immunity that the Supreme Court has previously declined to extend to such officials. *See Cleavinger v. Saxner,* 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (prison officials who adjudicate disciplinary hearings not entitled to absolute immunity for their constitutional violations, only qualified immunity). This may be an appropriate outcome, in that good time credits really only have value to the inmate to the extent they shorten his sentence, as opposed to segregated housing or loss of other privileges, which affect the conditions of an inmate's confinement and have an immediate impact on his quality of life. The purposes of deterrence may still be served by habeas actions and by the administrative exhaustion required of inmates. In other words, an inmate may have suffered no compensable injury if good time credits are lost pursuant to unconstitutional procedures, but ultimately restored before the length of his or her sentence is affected.

The Court is bound by *Sandin* and *Young.* Mr. Laws accordingly cannot base his due process claim on the temporary loss of his good-time credits.

b). Four–Point Restraints

■ Plaintiff points to his immobilization for four hours in four-point restraints as an atypical and significant hardship that supports a finding of a liberty interest. Defendant vehemently argues that plaintiff did not plead or prove that his placement in four-point restraints was proximately caused by the guilty finding at the intoxication hearing; that plaintiff's own conduct was the intervening superseding cause of his restraint; and that in any event, plaintiff did not demonstrate that the four-point restraint meets the *Sandin* standard.

Plaintiff argues that the jury could have found an atypical and significant hardship based on the four-point restraints, but as noted above, the existence of a liberty interest is a matter of law, and jury resolution is required only to the extent there are factual disputes regarding the duration or nature of the confinement. Further, any finding by the jury that Mr. Laws' placement in four-point restraints was an element of his due process claim would have to have been based on speculation, as the jury was not charged on this theory. Rather, the jury was instructed that:

[Plaintiff] claims that the defendants violated this right by failing to notify him and/or facilitate his presence at the hearing on his intoxication disciplinary charge. The plaintiff claims that as a result of the defendants' conduct, he was wrongly convicted of a disciplinary violation and punished. Even if the guilty violation is later overturned, you may

still consider whether prison officials deprived an inmate of his constitutional procedural rights related to a disciplinary hearing.

Jury Inst. at p. 17. In the proximate cause section of the charge, the jury was also instructed that Mr. Laws

> further alleges that as a result of being deprived of his right to present witnesses and evidence at the disciplinary hearing on November 20, 1995, he was immediately processed for and placed in the punitive restrictive housing unit. The defendants deny these allegations.

Jury Inst. at p. 22. This portion of the charge was adopted word-for-word from plaintiff's proposed charge. Upon reviewing plaintiff's proposed jury instructions and the Court's instructions which were given in this case, it is clear that plaintiff's immobilization in four-point restraints was not an aspect of plaintiff's due process claim at trial. In fact, both plaintiff's proposed charge and the one actually given contain no reference to four-point restraints at all. Further, placement in four-point restraints was never pled in plaintiff's Complaint as a stand-alone due process violation, *see* Amended Complaint, ¶ 24; it merely comprised part of the factual background.

Defendant also points to some case law finding as a matter of law that placement in four-point restraints does not constitute an atypical and significant hardship under *Sandin* and its interpretive progeny. The Court need not reach this question, however, because on this record, plaintiff has failed to produce sufficient evidence allowing for a finding in his favor. Had evidence been introduced regarding the frequency with which inmates are restrained in such a manner, how tightly the restraints were fastened, the effect on Mr. Laws of his restraint, and other issues, the Court, and the jury, might have been able to make the "fact-intensive inquiry" that is required by the Second Circuit when deciding whether an inmate has a liberty interest in being free of a certain form of restraint. *See, e.g.,* *McClary v. Kelly,* 4 F.Supp.2d 195 (W.D.N.Y.1998) (holding extensive hearings involving eleven witnesses and two mental health experts to determine whether years in administrative segregation implicated a protected liberty interest). The Court can envision circumstances under which the use of four-point restraints might implicate a constitutionally protected liberty interest. *See Artuz,* 230 F.3d at 18; *see also Sealey,* 197 F.3d at 586 ("especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical."); *Benjamin,* 77 F.3d at 769 ("Total immobilization in the restraints surely 'work[ed] a major disruption in [the inmate's] environment' "), *citing Sandin,* 515 U.S. at 482, 115 S.Ct. 2293. This is not the case, however, in which to make such a determination of law. As outlined above, plaintiff's case was not tried under this theory, and accordingly evidence necessary to the "significant deprivation" prong of *Sandin* was not introduced. In order to find a liberty interest at this juncture, the Court would have to speculate as to the usual conditions of confinement for inmates in Connecticut prisons, and in effect take "judicial notice" of the degree of restraint imposed on an inmate when they are chained to a bed in such a fashion, declaring that all such restraints are constitutionally invalid without procedural protections. On the facts of this case, Mr. Laws cannot predicate his entitlement to procedural protections on his placement into four-point restraints.

## C. Summary

Mr. Laws does not have a liberty interest that is protected by the Due Process

clause, as his good time credits were restored and there was insufficient evidence at trial to find that placement in four-point restraints was an atypical and significant deprivation. The Court accordingly erred by instructing the jury that Mr. Laws had such a liberty interest, and by allowing the due process claim to go to the jury. Defendant's Motion for Judgment as a Matter of Law (Doc. # 103) is therefore GRANTED on plaintiff's Due Process claim.

## B. *New Trial on Eighth Amendment Excessive Force Claim*

### 1. *Plaintiff's Motion on Grounds of Evidentiary Error*

■ Plaintiff seeks a new trial on his excessive force claim, arguing that he was substantially prejudiced by the Court's decision to exclude evidence that defendant Glover had been disciplined previously for failing to report an incident in which two white guards hung a "noose" from the ceiling in the presence of an African–American inmate. According to plaintiff, this evidence was relevant because it would have allowed the plaintiff to impeach Glover and demonstrate that his definition of "misconduct," which he denied in the instant case, was unusually narrow. The Court disagrees with plaintiff's assessment of the admissibility of this evidence, and further concludes that any evidentiary error did not affect "the substantial rights of the parties," as required by Rule 61.

At trial, the Court excluded the evidence, finding it irrelevant and inadmissible character evidence under Federal Rule of Evidence 404(b), which provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of the person in order to show action in conformity therewith." *See* Tr. at 351 (Ruling on Motion in Limine). Plaintiff argues that Glover's failure to report the incident in question was probative of his truthfulness, and that admitting the evidence would have allowed plaintiff to impeach Glover's testimony that the force he used during the incident with Mr. Laws was not excessive and did not constitute misconduct, and as such it should have been admitted. The Court is not persuaded by the plaintiff's argument, as the Second Circuit has stated that "we would consider it an abuse of discretion to admit [similar act] evidence if the other act were not sufficiently similar to the conduct at issue." *Ricketts v. City of Hartford,* 74 F.3d 1397, 1414 (2d Cir.1996). The previous incident did not involve the use of force, and bears no relation to the facts that are at the heart of Mr. Laws' claims. Even assuming that the previous discipline had some relevance to issues of Glover's truthfulness and credibility, its minimal probative value is substantially outweighed by unfair prejudice, given the nature of the incident and the factual dissimilarities.

■ Furthermore, plaintiff has not met his burden of showing that he is entitled to a new trial because "a substantial right of the party is affected. . . ." *Ricketts,* 74 F.3d at 1406. The jury found that all the defendants had used excessive force in subduing the plaintiff, thus indicating that they disbelieved Glover's testimony in any event. Glover was exonerated only on grounds of qualified immunity, not because the jury accepted his version of the events of November 20, 1995. Accordingly, any error in the questioned evidentiary ruling did not adversely affect any substantial right of Mr. Laws. *See United States v. Miles,* 889 F.2d 382, 384 (2d Cir.1989) (even if failure to allow defense to cross-examine principal government witness regarding a sham marriage was erroneous, error was harmless). Plaintiff's motion for a new trial (Doc. # 105) is accordingly DENIED.

## IV. Conclusion

As the deprivations suffered by Mr. Laws were neither atypical nor significant, he had no protected liberty interests, and thus he was not entitled to procedural due process at the disciplinary hearing. The Court erred by instructing the jury to the contrary, and by allowing the due process claim to go to the jury. Defendants' Motion for Judgment as a Matter of Law (Doc. # 103–1) is GRANTED, and their Motion for a New Trial (Doc. # 103–2) is therefore DENIED. Plaintiff is not entitled to a new trial due to evidentiary errors, and therefore his Motion for a New Trial (Doc. # 105) is DENIED.

IT IS SO ORDERED.