24-2548-pr
*Vidal v. Venettozzi*

# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2025

(Argued: September 22, 2025   Decided: April 1, 2026)

Docket No. 24-2548

JOSEPH VIDAL,

*Plaintiff-Appellant*,

–v.–

DONALD E. VENETTOZZI, Director of Special Housing Unit, Inmate Disciplinary Program, ERIC GUTWEIN, Commissioner Hearing Officer, WAYNE CARROLL, Recreation Supervisor, Disciplinary Employee Assistant, BRYAN P. ANSPACH, Disciplinary Office Assistant, in their Personal and Individual Capacities,

*Defendants-Appellees*.[*]

Before:       ROBINSON and MERRIAM, *Circuit Judges*.[†]

---

[*] The Clerk of Court is respectfully directed to amend the caption as reflected above.

[†] Circuit Judge Alison J. Nathan was originally a member of the panel but was unable to participate in consideration of this matter.  Pursuant to this Court's Internal Operating Procedures, the appeal was heard and decided by the remaining members of the panel, who are in agreement.  *See* 2d Cir. IOP E(b).

Plaintiff-Appellant Joseph Vidal appeals from a judgment of the United States District Court for the Southern District of New York (Román, *J.*) granting summary judgment to several New York Department of Corrections and Community Supervision ("DOCCS") officials on his Fourteenth Amendment procedural due process claim. Following a prison disciplinary hearing, Vidal was sentenced to 270 days—approximately nine months—of confinement in the special housing unit ("SHU"); he ultimately served at least 180 days. Vidal contends that he was denied basic procedural protections at his disciplinary hearing, including the opportunity to call witnesses and present documentary evidence in his defense.

The district court concluded that Vidal's sentence and SHU confinement did not implicate a protected liberty interest under the governing standard derived from *Sandin v. Conner*, 515 U.S. 472 (1995), and this Court's subsequent precedents, and therefore that no due process protections were required.

We disagree. Vidal's term of disciplinary segregation—whether we focus on the 270 days imposed, the 180 days served, or any other potentially applicable length of confinement—constitutes an atypical and significant hardship based on duration alone and thus implicates a liberty interest that triggers due process protections. We therefore **VACATE** the judgment and **REMAND** for further proceedings consistent with this opinion.

———————

AMIT JAIN (Devi M. Rao, Wynne Muscatine Graham, Nethra K. Raman, *on the brief*), MacArthur Justice Center, Washington, D.C., *for Plaintiff-Appellant*.

ANDREA W. TRENTO, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Judith N. Vale, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General of the State of New York, New York, NY, *for Defendants-Appellees*.

Matthew Marchiori, Hogan Lovells US LLP, Washington, D.C., Patience M. Tyne, Hogan Lovells US LLP, New York, NY, *for Amici Curiae*

Former Corrections Officials, *in Support of Plaintiff-Appellant*.

–––––––––––––

ROBINSON, *Circuit Judge*:

Plaintiff-Appellant Joseph Vidal appeals from a judgment of the United States District Court for the Southern District of New York (Román, *J.*) granting summary judgment to several New York Department of Corrections and Community Supervision ("DOCCS") officials on his Fourteenth Amendment procedural due process claim. Following a prison disciplinary hearing, Vidal was sentenced to 270 days—approximately nine months—of disciplinary segregation in the special housing unit ("SHU"); he ultimately served at least 180 days—approximately six months—in the SHU before he returned to the general population. Vidal contends that he was denied basic procedural protections at his disciplinary hearing, including the opportunity to call witnesses and present documentary evidence in his defense.

The district court concluded that Vidal's sentence and SHU confinement did not implicate a protected liberty interest under the governing standard derived from *Sandin v. Conner*, 515 U.S. 472 (1995), and this Court's subsequent precedents, and therefore that no due process protections were required.

3

We disagree. Whether we focus on the 270-day term of disciplinary segregation imposed, the 180 days Vidal ultimately served in the SHU pursuant to this sentence, or any of the other potentially applicable periods of his disciplinary confinement, Vidal's disciplinary segregation constitutes an atypical and significant hardship based on duration alone and thus implicates a protected liberty interest and triggers due process protections. We therefore **VACATE** the judgment and **REMAND** for further proceedings consistent with this opinion.

## I. Factual Background

At the time of the events giving rise to this action, Vidal was in the custody of DOCCS and incarcerated at Green Haven Correctional Facility. Defendants Donald E. Venettozzi, Eric Gutwein, Wayne Carroll,[2] and Bryan P. Anspach were DOCCS employees working at Green Haven.

### A. The March 6, 2015, Incident

The March 6, 2015, incident that ultimately led to this litigation occurred when Vidal was serving a prior disciplinary sentence imposed for the period from February 22, 2015, through May 23, 2015. That sentence commenced in the SHU. The parties dispute whether, at the time of the March 6 incident, Vidal had been serving this term in the SHU or whether he had transitioned to serving his sentence on keeplock status within the general population.

In any event, on March 6, 2015, Vidal was transferred to the A-Block at Green Haven Correctional Facility. Upon his arrival, a correctional officer told

---

[1] The facts are drawn from the defendants' Rule 56.1 statement, Vidal's response to Defendants' Rule 56.1 statement, and Vidal's verified complaint, which is treated as an affidavit for summary judgment purposes given that Vidal was not represented by counsel in the district court. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), *abrogated on other grounds by Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Unless otherwise noted, the recited facts are undisputed.

[2] Defendant Carroll's last name is misspelled throughout the record. This opinion uses the correct spelling.

Vidal he could not bring all the property he was carrying into the unit. Vidal contends that he then explained that he was authorized to possess the excess bags containing legal materials pursuant to approval from the superintendent and a DOCCS Directive, but the correctional officer was not persuaded.

The parties offer differing accounts of the altercation that followed. Vidal testified that after he was told he could not bring the legal materials into the A-Block, he went up a set of stairs to hand them to another incarcerated individual so that the books would not be discarded. As he descended the stairs, a correctional officer punched him multiple times. The correctional officers at the scene, on the other hand, reported that after he was told he could not bring in all his property, Vidal punched the correctional officer who told him that and then punched a second correctional officer who came to assist.

Following the incident, the officers issued two Inmate Behavior Reports charging Vidal with violent conduct, creating a disturbance, assault on staff, and refusing a direct order.

### B. The Disciplinary Hearing

Vidal's disciplinary hearing was held over the course of nine days between March 12, 2015, and May 11, 2015, before Hearing Officer Gutwein. Because Vidal was confined in the SHU pending the hearing, he was assigned a prison-appointed

6

"assistant," Defendant Carroll, to help prepare his defense. Defendant Anspach was the officer in charge of employee assistants during the time that Defendant Carroll served as a disciplinary assistant for Vidal.

In his verified complaint and sworn deposition, Vidal alleges the following with respect to his disciplinary hearing. Before the hearing, Vidal informed Carroll that several incarcerated individuals and a female correctional officer had witnessed the incident. He asked Carroll to see whether those witnesses would testify at his hearing, to obtain written statements from witnesses to the altercation, to get the A-Block logbook to identify the female officer present, and to procure a copy of DOCCS Directive #4913, which outlined the policy allowing additional bags of legal materials, among other documentary evidence. Carroll returned two days later and told Vidal that multiple incarcerated individuals had agreed to testify, but that Carroll had not obtained any written statements, the logbook, or the name of the female officer. Carroll told Vidal that he could call the female officer at the hearing, and Vidal understood from their conversation that the logbook and DOCCS directive could be available or requested at the hearing. However, at the hearing, Gutwein did not allow Vidal to call a number of witnesses, including the female officer. And Vidal was not permitted to get and introduce certain documentary evidence, including DOCCS Directive #4913 and

7

the A-Block logbook. These alleged failures underlie Vidal's procedural due process claims.

On May 11, 2015, Defendant Gutwein found Vidal guilty and imposed a penalty of 270 days of SHU confinement, to run from May 23, 2015, when Vidal's prior disciplinary sentence was scheduled to end, through February 17, 2016. Defendant Venettozzi affirmed the decision on administrative appeal on July 7, 2015.[3]

### C. Vidal's SHU Confinement

Vidal remained in the SHU for the 78 days between the March 6, 2015, incident and the May 23, 2015, start of the disciplinary sentence for the March 6 violations. Vidal served the first portion of his disciplinary sentence in the Green Haven SHU. On June 9, 2015, he was transferred to the SHU at Upstate Correctional Facility. Vidal was discharged from the SHU sentence after he served 180 days—approximately six months—counting from the start of the sentence for the March 6 violations, and at least 258 total days when considering his SHU confinement from March 6 until the beginning of his sentence.

---

[3] In a state court proceeding, Vidal challenged the determination that he had violated prison disciplinary rules. In 2017, a New York state appellate court concluded that the hearing officer had improperly denied Vidal's request to call a witness and thus annulled the disciplinary determination. *Vidal v. Annucci*, 149 A.D.3d 1366, 1368 (N.Y. App. Div. 3d. Dep't. 2017). By the time of that ruling, Vidal had completed his disciplinary sentence. *See id.* at 1368–69.

As to the conditions of his confinement, Vidal asserts, among other things, that his SHU confinement deprived him of free movement and physical access to the recreation available to individuals in the general population; daily showers; use of the telephone, television, and exercise equipment; social activities; regular visits without restrictions; physical access to the law library; voluntary rehabilitative programs; paid programs; job assignments; commissary purchases and food packages from home and outside vendors; unrestricted access to prescribed and over-the-counter medications; and timely medical treatment. He avers that, in contrast, individuals in the general population at that time had access to recreation during non-program hours—approximately six to seven hours per day.

For the most part, Defendants do not contradict Vidal's assertions. Defendants expressly acknowledge that individuals like Vidal who enter the SHU as a disciplinary sanction are limited to one hour of recreation per day, two items from the law library per week which must be returned within 24 hours, and two five-minute showers per week. Telephone calls and packages are also prohibited. Defendants do contest the allegation that Vidal's medical needs were not met during his time in the SHU.

In addition to these restrictions, many of which are "normal" SHU conditions, Vidal testified that the actual conditions he experienced in the SHU were more severe than those described in the regulations. According to his sworn account, Green Haven's SHU lacked a ventilation system and did not have fans on the cell galleries. During hot and humid weather, the cells became "extremely hot" and "like an oven," particularly when sunlight beamed into the cells. Jt. App'x at 250. The heat was intensified by the presence of steel bars and metal portions of the cell walls and, unlike individuals housed in general population, those confined in the SHU had limited access to ice machines or cold water to mitigate the heat.

## II. Procedural History

Representing himself, Vidal brought this action under 42 U.S.C. § 1983 in the United States District Court for the Southern District of New York against Defendants Venettozzi, Gutwein, Carroll, and Anspach.[4] As relevant here, he alleges that Defendants violated his right to due process in connection with the disciplinary proceedings that resulted in his confinement in the SHU.[5] In

---

[4] Vidal's initial complaint named over three dozen other defendants and encompassed other events. But his operative second amended complaint was limited to these four defendants.

[5] Vidal also raised claims under the First and Eighth Amendments. On appeal, Vidal pursues only his Fourteenth Amendment procedural due process claim, so we deem his other claims abandoned. *See Cruz v. Gomez*, 202 F.3d 593, 596 n.3 (2d Cir. 2000) ("When a litigant—including a *pro se* litigant—raises an issue before the district court but does not raise it on appeal, the issue is abandoned.").

particular, Vidal alleges that Defendant Gutwein violated his Fourteenth Amendment procedural due process rights by denying him the opportunity to call certain witnesses and present certain documentary evidence at his disciplinary hearing, that Defendant Venettozzi failed to remedy the violation on administrative appeal, and that Defendants Carroll and Anspach did not adequately assist him in preparing his defense.

After discovery, Defendants moved for summary judgment, arguing principally that Vidal's SHU confinement did not deprive him of any protected liberty interest subject to due process protections. They also argued that Defendant Venettozzi was entitled to qualified immunity because it was not clearly established at the time that affirming a disciplinary disposition could constitute a constitutional violation, and that Vidal had failed to establish Defendant Anspach's personal involvement. Defendants did not contend that the procedures afforded were constitutionally sufficient if the disciplinary confinement implicated a protected liberty interest.

The district court granted summary judgment to Defendants, concluding that the duration and conditions of Vidal's confinement did not implicate a protected liberty interest such that Vidal was entitled to due process. The court did not address Defendants' other arguments. Vidal appeals.

11

**DISCUSSION**

This Court reviews a district court's grant of summary judgment without deference "after construing all evidence, and drawing all reasonable inferences, in favor of the non-moving party." *Sotomayor v. City of N.Y.*, 713 F.3d 163, 164 (2d Cir. 2013).[6] "Summary judgment is appropriate only when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*.

For the reasons that follow, we conclude that Vidal's term of disciplinary segregation in the SHU, however measured, implicates a protected liberty interest based on duration alone. In explaining our conclusion, we start with the law and then apply it to this case.

### I. Disciplinary Segregation and Due Process

A procedural due process claim arises under the Fourteenth Amendment when a plaintiff has a protected liberty interest and is deprived of that interest "without due process of law." *Taylor v. Rodriguez*, 238 F.3d 188, 191 (2d Cir. 2001). In the prison context, a protected liberty interest may arise from expectations created by state laws or policies when disciplinary confinement imposes an

---

[6] In quotations from caselaw and the parties' briefing, this opinion omits all internal quotation marks, footnotes, and citations, and accepts all alterations, unless otherwise noted.

"atypical and significant hardship in relation to the ordinary incidents of prison life." *Welch v. Bartlett*, 196 F.3d 389, 392 (2d Cir. 1999) (quoting *Sandin*, 515 U.S. at 484); *see also Wilkinson v. Austin*, 545 U.S. 209, 222 (2005) ("[A] liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in *Sandin v. Conner*."). When a liberty interest is implicated, incarcerated individuals are entitled to the procedural protections of the Due Process Clause at disciplinary hearings. *See Wolff v. McDonnell*, 418 U.S. 539, 557 (1974).

Defendants do not deny that New York state regulations may give rise to a liberty interest in avoiding disciplinary segregation. *See Palmer v. Richards*, 364 F.3d 60, 64 n.2 (2d Cir. 2004) ("It is undisputed . . . that New York state law creates a liberty interest in not being confined to the SHU."); *see also* 7 N.Y.C.R.R §§ 254.7(a)(1)(v), 301.2(a) (2015). At issue here is only whether Vidal can satisfy the "atypical and significant hardship" standard.

In determining whether disciplinary confinement is sufficiently onerous to impact a protected liberty interest, this Court focuses on two factors: the duration of the confinement and the conditions under which it occurs. *See Palmer*, 364 F.3d at 64. "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions

13

endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197

F.3d 578, 586 (2d Cir. 1999).

To assess whether confinement is atypical and significant, we compare the challenged confinement to "periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration." *Kalwasinski v. Morse*, 201 F.3d 103, 107 (2d Cir. 1999). "Whether the conditions of . . . confinement constitute an atypical and significant hardship requires that they be considered in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Welch*, 196 F.3d at 393; *see also Brooks v. DiFasi*, 112 F.3d 46, 49 (2d Cir. 1997) (explaining that *Sandin* requires "careful examination of the actual conditions of the challenged punishment compared with ordinary prison conditions").

Following this guidance, we have considered whether and when the duration of disciplinary segregation by itself rises to the level of an atypical and significant hardship, as well as whether and when particularly burdensome conditions may be atypical and significant even if imposed for a relatively short duration.

*A. Duration*

This Court has long recognized that the duration of disciplinary segregation may itself render that confinement an atypical and significant hardship in relation to the "ordinary incidents of prison life." *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000).

In *Colon*, we held that 305 days of disciplinary confinement under "normal" SHU conditions constituted an atypical and significant hardship. *Id.* at 231–32. We noted that the "longest confinement in normal SHU conditions that we ha[d] ruled was *not* shown to meet the [atypical and significant] standard was 101 days." *Id.* at 231 (emphasis added) (citing *Sealey*, 197 F.3d at 589–90). We refrained from setting a floor on the duration of disciplinary segregation in normal SHU conditions that may trigger a protected liberty interest. Instead, we held that "wherever the durational line is ultimately drawn, 305 days satisfies the standard." *Id.*

In *Colon*, we anticipated that "continuing litigation" would provide "further content" relating to the applicability of the atypical and significant hardship standard to shorter terms of confinement. *Id.* at 232. We suggested that evidence regarding the "precise frequency of SHU confinements of varying durations" and evidence regarding the "psychological effects of prolonged confinement in

15

isolation" would help courts assess whether a term of disciplinary SHU confinement constitutes an atypical and significant hardship. *Id.*

Since *Colon*, we have continued to refrain from establishing a bright-line minimum duration of disciplinary segregation that constitutes an atypical and significant hardship. And we "have explicitly noted that SHU confinements of *fewer* than 101 days could constitute atypical and significant hardship" if either (1) "the conditions were more severe than the normal SHU conditions" or (2) "a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65 (emphasis added); *accord Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *see also Ortiz v. McBride*, 323 F.3d 191, 195 n.1 (2d Cir. 2003) ("*Ortiz I*") ("It is . . . not obvious that *Sealey* established a *per se* rule that [a] SHU confinement under normal conditions and of a duration of 101 days or less necessarily involves no protected liberty interest" because the *Sealey* Court noted that "the record in that case was less than adequate" and "arguably left open the possibility that a more complete record . . . might show that a 101-day confinement in SHU does implicate a constitutionally protected liberty interest.").

Since that time, we have held that "[i]n the absence of factual findings to the contrary," *administrative* segregation in a SHU of 188 days "is a significant enough

16

hardship to trigger *Sandin*." *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013). If anything, *disciplinary* segregation of that length would impose more of a hardship than *administrative* segregation because the disciplinary confinement is not subject to periodic review. *Cf. Walker v. Bellnier*, 146 F.4th 228, 232, 234 (2d Cir. 2025) (correctional officials are "constitutionally obligated to conduct regular, meaningful reviews" of an individual's solitary confinement in administrative segregation particularly because "its stated purpose is prevention, not punishment").

Taken together, these decisions make clear that our precedents do not impose a fixed minimum duration for disciplinary segregation under ordinary SHU conditions to constitute an atypical and significant hardship. Rather, they recognize that disciplinary SHU confinement of 305 days is an atypical and significant hardship; administrative SHU confinement of 188 days is an atypical and significant hardship absent evidence to the contrary; and SHU confinement substantially shorter than the 305-day term at issue in *Colon*—including periods at or below 101 days—may satisfy the *Sandin* standard where the record supports such a conclusion.

*B. Conditions of Confinement*

The second pivotal factor in evaluating whether confinement constitutes an atypical and significant hardship is the conditions of an individual's confinement. *See Palmer*, 364 F.3d at 64. Our cases considering this factor often distinguish between the "normal" conditions of disciplinary segregation and conditions that are even further removed from the ordinary incidents of prison life. *See, e.g., id.* at 65 n.3 (explaining that "normal conditions of SHU confinement in New York" at the time included placement in a solitary confinement cell, confinement to the cell for 23 hours per day, one hour of daily exercise, two showers per week, limited visitation, restrictions on the number of books permitted in the cell, and the denial of various privileges such as out-of-cell work and schooling); *see also* 7 N.Y.C.R.R. pts. 300–305 (2015) (describing similar SHU restrictions). Where conditions are more restrictive or onerous than these typical features of disciplinary segregation, the *duration* of the confinement may not matter as much.

In *Palmer*, we held that a seventy-seven-day keeplock sentence, served in the SHU of a different New York prison, could constitute an atypical and significant hardship based on the conditions of confinement. *See* 364 F.3d at 66. There, the plaintiff averred that he was deprived of personal property, hygiene products, reading and writing materials, school books, personal food, and vitamin

18

supplements, and that he was mechanically restrained whenever escorted outside his cell. *Id.* In light of these conditions, we concluded that the plaintiff had raised genuine questions of material fact as to the conditions of his confinement compared to those of the general prison population, and that he might be able to establish that the confinement violated a liberty interest despite the "comparative shortness" of his confinement. *Id.*

Likewise, in *Ortiz II*, the plaintiff alleged that for several weeks of his ninety-day SHU sentence, he was confined to his cell for twenty-four hours per day, denied the daily out-of-cell exercise ordinarily afforded to individuals in the SHU, denied deodorant and toothpaste, denied eating utensils, and prevented from showering "for weeks at a time." *Ortiz v. McBride*, 380 F.3d 649, 651, 655 (2d Cir. 2004) ("*Ortiz II*"); *see also Ortiz I*, 323 F.3d at 193. We concluded that the plaintiff had sufficiently pled that "conditions in SHU [were] far inferior to those prevailing in the prison in general," and were thus sufficiently "atypical and significant" to satisfy the first step of the due process inquiry. *Ortiz II*, 380 F.3d at 655.

Our most recent consideration of atypical and significant hardship in *Baltas v. Chapdelaine*, 153 F.4th 328 (2d Cir. 2025), adds little to the analysis. In that case, the plaintiffs challenged their placement in "Q-Pod," a transitional unit for individuals "transitioning from more restrictive conditions of confinement, such

19

as punitive segregation, back to general population." *Id.* at 332. The Court emphasized that most of the challenged Q-Pod conditions did not "significantly differ from other routine prison conditions." *Id.* at 338. Among other things, individuals in the Q-Pod had daily visitation privileges. *Id.* at 333. Although some plaintiffs alleged long stays in Q-Pod (nearly five months), they did not challenge the process that initially placed them in restrictive housing units. *Id.* at 333, 339. On those allegations, we held only that defendants were entitled to qualified immunity because existing precedent did not clearly establish that Q-Pod confinement, "even for the longest periods alleged, violated Plaintiffs' procedural due process rights." *Id.* at 339.

## II.    Vidal's Confinement

We consider Vidal's claim in light of the above caselaw. We lack the kind of developed record this Court advocated in *Colon*. *See* 215 F.3d at 232 (suggesting that data concerning the frequency of prolonged confinement in isolation and evidence of the psychological effects of prolonged confinement would assist courts in applying the *Sandin* standard). The summary judgment record does not include data as to the percentage of individuals in DOCCS facilities who were confined to disciplinary segregation in 2015, nor as to the typical duration of their confinement

20

in the SHU.  *Cf. Welch*, 196 F.3d at 392 (noting that almost 10% of all inmates received SHU punishment, and 40% of those were confined for less than 90 days).

Nevertheless, for several reasons, we hold that the duration of Vidal's disciplinary segregation alone was an atypical and significant hardship in relation to the ordinary incidents of prison life and thus implicates a protected liberty interest.  And we reach this conclusion regardless of how that duration is measured—whether by the aggregate length of Vidal's prior disciplinary sentence and the 270-day sentence imposed following the March 6 hearing; the 270-day sentence alone; the 258 days he served in the SHU from the March 6 incident until his return to the general population; or even the 180 days he actually served pursuant to the sentence for the March 6 incident.[7]

First, Defendants have not offered evidence that disciplinary segregation of the duration imposed on or served by Vidal was a common incident of prison life

---

[7] We reject Defendants' contention that a challenge based on the duration of Vidal's term of disciplinary segregation is "unpreserved for appellate review."  Defendants-Appellees' Br. at 18. We construe submissions submitted by *pro se*, or self-represented, litigants "liberally" and read them "to raise the strongest arguments they suggest."  *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017).  In opposing summary judgment, Vidal expressly argued that "[t]he 270 days imposed to disciplinary special housing unit confinement and the 258 days served under the conditions complained of created an atypical and significant hardship in comparison to the general population in violation of plaintiff's liberty interest under the due process clause to the United States Constitution."  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 3, *Vidal v. Venettozzi*, No. 18-CV-6184, 2023 WL 4421876 (S.D.N.Y. July 10, 2023), Dkt. No. 99.

21

in New York in 2015. As noted above, we have held that in the absence of such evidence, we have had "little difficulty concluding that . . . 188 days of administrative confinement" "is a significant enough hardship to trigger *Sandin*." *J.S.*, 714 F.3d at 106; *see also Palmer*, 364 F.3d at 65–66 ("In the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was . . . less than . . . 30 days . . . and there was no indication that the plaintiff endured unusual SHU conditions."). Accordingly, even if we only consider the shortest possible interval here—the 180 days Vidal actually served in the SHU for the March 6 incident—our caselaw squarely supports the conclusion that in the absence of countervailing evidence — and there is none here—such confinement imposed an atypical and significant hardship.

Moreover, though we lack *record* evidence on this point, developments in caselaw, research, and state law since we decided *Colon* underscore that the durational threshold for a liberty interest based on disciplinary segregation under "normal" SHU conditions is well below the 305-day sentence at issue in *Colon*.

As this Court recently recognized, contemporary "courts and . . . international bodies" have "regularly" recognized the "physical and psychological hardship faced by individuals in solitary confinement." *Walker*, 146

22

F.4th at 233–34 (citing the work of state legislatures, the American Bar Association, and international organizations such as the United Nations, recognizing the toll of solitary confinement and seeking to limit overuse of the practice); *see also Porter v. Clarke*, 923 F.3d 348, 355 (4th Cir. 2019), *as amended* (May 6, 2019) ("[A]dvances in our understanding of psychology and new empirical methods" have demonstrated that "the nature and severity of the adverse psychological effects attributable to prolonged placement of inmates in isolated conditions [is] materially indistinguishable from" those faced on "death row."); *Palakovic v. Wetzel*, 854 F.3d 209, 225–26 (3d Cir. 2017) (emphasizing a "robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary confinement," which could amount to cruel and unusual punishment in violation of the Eighth Amendment).

These judicial decisions reflect the empirical evidence: A sister circuit noted that the "leading survey of the literature" on solitary confinement found, "there is *not a single published study* of solitary or supermax-like confinement in which nonvoluntary confinement lasted for longer than 10 days, where participants were unable to terminate their isolation at will, *that failed to result in negative psychological effects*." *Porter*, 923 F.3d at 356 (quoting Craig Haney, *Mental Health Issues in Long-*

23

*Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 132 (2003)) (emphasis in original).

This growing awareness has informed recent legislative and regulatory developments. Several states—including within this Circuit—have laws or regulations limiting the use of disciplinary solitary confinement to short, defined periods. *See* Conn. Gen. Stat. Ann. § 18-96b(e)(2) (effective July 1, 2022) (providing, in relevant part, that "[n]o person may be placed in isolated confinement for . . . more than fifteen consecutive days or thirty total days within any sixty-day period"); N.Y. Corr. Law § 137(6)(i)(i) (effective Mar. 31, 2022) (prohibiting placement in segregated confinement for more than "fifteen consecutive days" and "twenty total days within any sixty day period" absent specific criteria).

While the relevant New York statute limiting disciplinary segregation to periods of fifteen consecutive days passed in 2021 postdates Vidal's confinement and thus does not definitively benchmark the ordinary incidents of prison life in New York as of 2015, it is emblematic of New York's trend toward shorter periods of disciplinary segregation. *Cf. Perry v. Spencer*, 94 F.4th 136, 156 (1st Cir. 2024) ("Using a state's own regulations to inform the durational inquiry . . . helps to focus the inquiry on the reasonable expectations that the state's own laws and

policies have generated about what an inmate reasonably should understand to constitute the basic experience of prison life.").

In reaching our conclusion, we need not resolve the factual dispute as to whether Vidal's confinement in the SHU on a prior sentence was contiguous with his assignment to the SHU following the March 6 incident, and we need not rely on the prior sentence to determine that Vidal's sentence was atypical and significant. We have held that "separate SHU sentences should be aggregated for purposes of the *Sandin* inquiry when they constitute a sustained period of confinement." *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001); *Sealey*, 197 F.3d at 587–88 (aggregating two periods of SHU segregation); *id.* at 587 n.7 ("[I]f conditions were of sufficient harshness that confinement for 365 days constituted atypicality, an official who held a hearing for a prisoner already confined in such conditions for 364 days would normally have to accord procedural due process before continuing the confinement beyond an aggregate interval of 365 days.").

Given the undisputed facts that Vidal had served a prior sentence in the SHU from at least February 22, 2015, through *at least March 3, 2015*, that, *at a minimum*, he was in keeplock status between March 3 and March 6, and that he was returned to the SHU for an additional 58 days until his sentence for the March 6 infraction began, Vidal could make a compelling argument that the relevant

duration of his disciplinary segregation here was far longer than the 180 days he served in connection with the sentence for the March 6 incident. *See, e.g.*, *Hynes v. Squillace*, 143 F.3d 653, 658–59 (2d Cir. 1998) (analyzing keeplock confinement under *Sandin*). We need not rely on aggregation here, however, because even the shortest possible increment of disciplinary segregation—180 days—triggers a protected liberty interest. *Accord Colon*, 215 F.3d at 232 (Newman, *J.*, expressing his view that "confinement in normal SHU conditions of more than 180 days meets the *Sandin* standard").

Likewise, because the duration of Vidal's disciplinary segregation alone impacted a protected liberty interest, we need not decide whether Vidal has created a disputed issue of fact as to whether the specific *conditions* of his confinement were more onerous than the conditions typically associated with a segregated housing unit, nor how those conditions impact the durational analysis.

We emphasize that we do not suggest that 180 days is a floor below which duration alone cannot implicate a liberty interest under normal SHU conditions. As in *Colon*, we conclude that "wherever the durational line is ultimately drawn," 180 days plainly "satisfies the standard." *Colon*, 215 F.3d at 231.

Given that the district court did not address Defendant Venettozzi's qualified immunity defense or Defendant Anspach's personal involvement, we leave those questions for the district court to consider on remand.

**\*\*\***

For the above reasons, we **VACATE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.